**AFFIDAVIT IN SUPPORT OF
APPLICATIONS FOR SEIZURE WARRANTS**

I, Roger Kimmel, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the United States Secret Service ("USSS"), and have been since September 2002. I graduated from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and the USSS Special Agent Academy in Beltsville, Maryland. Prior to joining the USSS, I was an Intelligence Officer in the United States Marine Corps for four years. I have a Bachelor's Degree in Political Science with a minor/emphasis in Criminology. I am a law enforcement officer as that term is used in Federal Rule of Criminal Procedure 41 and am currently assigned to the Lexington, Kentucky Resident Office. My duties include investigating violations of federal laws constituting financial crimes, and I am authorized by the Attorney General to request a seizure warrant.

2. The information contained in this affidavit is based upon my personal knowledge, my consultation with other Secret Service agents and task force officers, my review of certain records and documents, interviews of witnesses, and information provided by other state and local law enforcement officers.

3. This affidavit is made for the limited purpose of supporting the civil forfeiture of certain property, which I have probable cause to believe constitutes proceeds of violations of 18 U.S.C. § 1343 (Wire Fraud), or is traceable thereto, or are involved in

or constitute the proceeds of a violation of 18 U.S.C. § 1957, or are traceable to such property.

4. The information contained in this affidavit is based on my personal knowledge, knowledge conveyed to me by other law enforcement officers involved in this investigation, and information obtained from documents, electronic databases, and witnesses. I provide the information contained in this affidavit for the purpose of establishing probable cause for seizure warrants. This affidavit does not contain all the details of the case as they are known to me.

## PURPOSE OF AFFIDAVIT

5. This affidavit is submitted in support of an application for a civil forfeiture seizure warrant for the following assets:

   a. Proceeds from the sale of 906 Chimney Rock Road, Harrodsburg, KY, amounting to $361,556.33. This residence was built in 2013 and contains approximately 5,200 square feet. This sale took place on or about November 10, 2020.

   b. Proceeds from the sale of a 2016 Sea Ray model 21 SPX bearing Kentucky registration number KY-0745-JA, amounting to $38,500. This sale took place on or around September 16, 2020.

Throughout this affidavit, I will refer to these assets collectively as the "SUBJECT ASSETS".

6. The SUBJECT ASSETS are all located in JP Morgan Chase Bank NA account *8357, in the name of Dickinson Wright PLLC Kentucky IOLTA.[1]

7. As set forth below, I submit that there is probable cause to believe that the SUBJECT ASSETS constitute proceeds of a violation of 18 U.S.C. § 1343, or are traceable to such property, or are involved in or constitute the proceeds of a violation of 18 U.S.C. § 1957, or are traceable to such property. These assets are, therefore, subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) (civil forfeiture) and 18 U.S.C. § 981(b) (civil seizure).

## FORFEITURE AND SEIZURE AUTHORITY

8. As to civil forfeiture, under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States. In addition, under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting a 'specified unlawful activity'" is subject to forfeiture to the United States. A violation of 18 U.S.C. § 1343 constitutes a "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). Property subject to civil forfeiture under 18 U.S.C. § 981(a)(1) may be seized pursuant to 18 U.S.C. § 981(b).

---

[1] In a recent hearing on a civil case related to this same matter, Judge Caldwell directed that Counsel for William Evans maintain the assets in his escrow account until further order of the Court (R. 20: Order, 5:20-226-KKC). Judge Caldwell clarified that a duly authorized seizure warrant did constitute an order of the Court (R: 31: Order, 5:20-226-KKC).

3

9. For the reasons outlined below, the United States seeks civil seizure warrants, authorizing law enforcement to seize the SUBJECT ASSETS and preserve them pending further forfeiture proceedings.

## STATEMENT OF PROBABLE CAUSE

10. This affidavit will show that William S. Evans did knowingly and with intent violate the federal wire fraud statute (18 U.S.C. § 1343). In addition, this affidavit will show that William S. Evans and Frances Evans received wire transfers into their personal accounts and accounts controlled by them and that these funds originated from known victims in the Eastern District of Kentucky. The funds were the proceeds of wire fraud and were transferred into personal property, as described below.

11. On May 14, 2020, members of the investigative team, along with CFTC officers, conducted a phone interview with Victim 1 and Victim 2, a married couple. During this phone interview, Victim 1 stated she met William S. Evans while working at Logans of Lexington. Victim 1 stated they met Evans through an unnamed co-worker, who was familiar with Evans and his investing company. At that time, Victim 1 had investments with Raymond James and Fidelity Investments. Victim 1 stated she was unhappy with their current investments as they did not have sufficient control of their money.

12. Victim 1 had several meetings with Evans prior to investing with him and his company, Turning Point Investments. During these investment meetings with Victim 1, Evans provided three binders of investment-related material and charts along with a contract to sign to begin investing. Victim 1 stated during their meetings with Evans, they were shown Standard and Poor's 500 (SP500) investment graphs and charts, which were

4

computer generated documents. When Victim 1 was asked if they were provided investment advice from Evans, she stated that Evans had reviewed and discussed their current investments and provided her informational documents to review. Victim 1 stated that Evans only invested in the SP500 and had a small group of investors that he could manage more closely. Evans promised Victim 1 double-digit profits through trading, with a maximum risk of loss of 5-8%, and access to her funds on demand. As will be demonstrated below, Evans expended all of her money after pooling it with other investor funds and then unlawfully disposing of it into commodity trading accounts or personal expenditures.

13.     Victim 1 stated Evans purports to meet with clients once a year to review their investments. Victim 1 stated the compensation agreement with Evans is 2-3% of the total profit that is generated by all his investors. Victim 1 asked Evans about taxes and early withdrawal penalties from her retirement accounts, and Evans stated he has already set aside money to cover the taxes and can write them a check in 2021 to cover that amount.

14.     In January 2020, at the direction of Evans and based on his representations, Victim 1 requested that her retirement accounts be liquidated early and that approximately $227,000 and $773,000 be wired to an account at Central Bank (account no. ending 0904) listed as William S. Evans DBA Turning Point Investments, on which William and Frances Evans were both signers ("the DBA account").

15.     On Friday May 1, 2020, a Central Bank BSA investigator placed a phone call to William S. Evans, after being contacted by Raymond James on behalf of Victim 1. During the call with Evans, Evans stated that his clients signed a contract, and he agreed

to send a copy to the Central Bank investigator. On May 3, 2020, Evans emailed the investigator and provided one-page of a signed contract between Victim 1 and him. Evans stated this was the full contract between them. This is not the complete and signed contract provided by Victim 1 to law enforcement. A full copy of the contract Victim 1 possessed is four pages in length.

16. At a meeting between Victim 2 and Evans on or around March 7, 2020, Evans indicated that he was not licensed. When Victim 2 asked Evans how he was able to invest other individuals' money if he was not registered to do so, Evans claimed he was only investing in futures and this did not require him to be registered. Consultation with the CFTC confirmed that he needed to be registered with the CFTC to solicit and accept Victim 1 and 2's funds to trade in a commodity pool, and he did not, which is therefore in violation of federal criminal law. Evans claimed that the profits he made from trading in February 2020 would have covered tax liability incurred as a result of premature distribution of Victim 1's retirement accounts. According to a review of his trading activity in February 2020, however, he only incurred losses. Finally, Victim 2 stated that Evans refused to disclose the total dollar amount that is currently in the "fund".

17. The investigative team has spoken with or learned of at least 20 individuals who invested with Evans from a period of March 1, 2012 to May 11, 2020. A review of bank records show that investor funds were pooled together in Evans' bank accounts. The investigative team has spoken with these depositors and confirmed that they, like Victims 1 and 2, were induced to invest with Evans on the promise of significant gains, low risk, and coverage of their tax and other liquidation penalties.

18.     Evans did transfer a significant amount of investor funds, which were pooled together in his personal bank account, to the Ironbeam[2] account ending in 8734 of Frances Wombwell Evans. According to the Frances Wombwell Evans account opening documents at Ironbeam, this account was being opened for her personal investment purposes. By placing this investor money in the personal trading account of Frances Evans, which, despite being a CPO, meant they did not have to certify themselves as registered brokers or pool operators, the Evanses were able to unlawfully trade pooled investor money on a commodities market without proper registration. Despite his representation to Victim 1 of guaranteed double-digit profits, information from the CFTC revealed that Evans incurred repeated losses of investors' money.

19.     In sum, there is probable cause to believe that Evans has committed federal criminal violations, by convincing investors through misrepresentations to invest vast sums of money with him and then either trading that money unlawfully or pilfering the money for personal expenditures.

**SUBJECT ASSETS**

20.     As previously mentioned, during the aforementioned time period, investor funds were deposited into bank accounts controlled by Evans. These accounts are located at Chase Bank and Central Bank. The accounts were in the names of William S. Evans, William S. Evans and Frances Evans, and William S. Evans DBA Turning Point

---

[2] According to its website, Ironbeam, located in Chicago, IL, is "an FCM and futures broker providing cutting edge technology, support, and clearing services to brokers and traders worldwide." See https://www.ironbeam.com/.

Investments. During the aforementioned time period, investors gave Evans approximately $20 million dollars that he deposited into various bank accounts. The investor funds into the accounts were the main source of income for Evans. The investors' funds were co-mingled in the Evans' bank accounts until a portion of them were transferred to Wedbush or Ironbeam investment accounts in the name of either William S. Evans or Frances Evans.

21. Chase Bank account *262 is in the name of Frances W. Evans and William S. Evans III. Evans funded this account. Between April 2013 and May 2020, $8,858,079.47 of investor money entered this account. The account was funded solely with investor money. This account does not show any other source of income for Evans outside of his investment scheme.

22. Of the funds that remained in Chase Bank account *262 after transferring to Wedbush or Ironbeam, nearly all of it was used for personal purposes by the Evanses. This included substantial payments related to 906 Chimney Rock Road. For example:

   a. In March 2016, Evans obtained a home equity line of credit secured on 906 Chimney Rock Road, Harrodsburg, KY in the amount of $355,500.00 to pay for renovations and home improvements, which he used and then repaid on a revolving basis. Between the dates of March 2016 and May 29, 2020, Evans made repayments of $936,179.25 to this line of credit at Huntington National Bank out of Chase Bank account *262.

   b. Furthermore, between the dates of July 2013 and December 2018, Evans paid Hubbuch and Co. (an Interior design company) $49,366.43 out of Chase Bank account *262, for furnishings for the 906 Chimney Rock Road. This was confirmed by the sales associate who assisted the Evanses place the orders, and who also confirmed that all items were delivered to the 906 Chimney Rock address.

    c. Additional personal expenditures related to the 906 Chimney Rock Road property include the following checks, which are a small portion of what was written out of the Chase Bank account *262.

        1. Natures Expressions check number 7604 on April 24, 2015 in the amount of $9750.00. Memo line states "Patio Construction"

        2. Natures Expressions check number 7669 on July 20, 2015 in the amount of $25,000.00. The memo line states, "payments patio"

        3. Natures Expressions check number 7701 on August 27, 2015 in the amount of $3,375.00. The memo line states, "Last payment lake patio"

        4. Thomas Sims check number 7733 on September 17, 2015 in the amount of $1,200.00. The memo line states "dock"

        5. Natures Expressions check number 7913 on June 21, 2016 in the amount of $7,290.00. The memo line states "Lake driveway bushes"

        6. Patrick Cooper Painting Contractor Inc. on July 25, 2016 in the amount of $2,360.00. The memo line states "dock"

23. The U.S. Secret Service executed a search warrant in May 2020, and located a 2016 SeaRay boat in the covered dock to the rear of 906 Chimney Rock Road. According to the seller of this boat, who was interviewed by the U.S. Secret Service, this vessel was purchased on April 28, 2016, from SeaRay of Cincinnati. This boat was also purchased with investor money, as demonstrated by the following transactions:

    a. On April 28, 2016, the Evanses purchased this vessel for a total price of $55,949.00, using a Citizens Bank home equity line of credit check, Check number 527, made out to SeaRay of Cincinnati and signed by Frances Evans.

    b. On April 29, 2016, an electronic payment was made to Citizens Bank in the amount of $45,000.00 from Chase Bank account *262, which was funded by investor funds.

    c. On May 2, 2016, an electronic payment was made to Citizens Bank in the amount of $100,000.00 from Chase Bank account *262, which was also funded by investor funds.

## CONCLUSION

24. This affidavit presents probable cause to believe that William S. Evans, III committed wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. § 1957, and that the SUBJECT ASSETS represent proceeds, or property traceable to proceeds, of wire fraud and/or property involved in, or traceable to property involved in, money laundering. On this basis, I submit that the SUBJECT ASSETS are, therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a), and I seek authority to obtain seizure warrants for each of the SUBJECT ASSETS pursuant to 18 U.S.C. § 981(b).

**Signed remotely per FRCP 4.1. See addendum.**
Special Agent Roger Kimmel
United States Secret Service

Sworn to before me on January __20th__, 2021

_____
UNITED STATES MAGISTRATE JUDGE

10